United States District Court
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARSHALL FIELD, | No. C-09-5972 EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT GEVITY'S MOTION FOR SUMMARY JUDGMENT; AND FINDING AS MOOT PLAINTIFF FIELD'S MOTION FOR SUMMARY JUDGMENT** |
| AMERICAN MORTGAGE EXPRESS CORP., *et al.*, | |
| Defendants. | **(Docket Nos. 62, 67)** |
| _____/ | |

    Plaintiff Marshall Field has filed a class action against Defendants American Mortgage Express Corp. ("AMX") and Gevity HR, Inc., asserting that the companies were his joint employers and failed to pay wages and earned vacation in violation of the California Labor Code. AMX has not made an appearance in this case – apparently, because it is now a defunct company. Currently pending before the Court are Mr. Field and Gevity's motions for summary judgment. In his motion, Mr. Field asks the Court to rule as a matter of law that Gevity was the joint employer of the putative class. (No class has been certified as of yet.) In its motion, Gevity asks the Court to rule as a matter of law that Gevity was not the joint employer of Mr. Field specifically.

    Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Gevity's motion for summary judgment. Because the Court is granting Gevity's motion, Mr. Field no longer has any claims against Gevity and cannot

be a class representative with respect to any claims against Gevity. Accordingly, his motion for summary judgment is moot.[1]

## I. FACTUAL & PROCEDURAL BACKGROUND

With respect to the issue of whether Gevity was the joint employer of Mr. Field specifically, the evidence presented by the parties reflects as follows. (Where there are disputed facts and/or evidentiary objections, they are so noted here and/or within the legal discussion below. Only those disputed facts and/or evidentiary objections that are necessary to address are included.)

Gevity and AMX entered into a Professional Services Agreement in or about early 2005. *See* Barr Depo., Ex. 4 (Professional Services Agreement). Under the agreement, Gevity would provide certain services to AMX for which it would receive a fee. The services are described as follows:

> Gevity will offer Client a suite of online and consultative services, programs, products and tools designed to help Client: (i) find the right employees by developing an effective recruiting strategy, (ii) develop WSEs' [worksite employees'] abilities by using tools for skills assessment and training, (iii) retain the best WSEs by offering a variety of perks and benefits, (iv) manage its employment-related paperwork and take care of business matters while Gevity handles payroll, processing, tax deductions and deposits, unemployment claims and administration of health and pension plans, and (v) protect its business by utilizing Gevity's offering of risk management products and consultations in areas such as workers' compensation ("WC") and employee safety practices, regulatory compliance, human resources forms and best practices, drug-free workplace templates and more.

*Id.* (Professional Services Agreement § 6.C) (emphasis added). Thus, per the agreement, services that Gevity would provide included payroll and consultations regarding human resources.

Gevity and AMX agreed that, for Gevity to provide the above services, including payroll, it would become a co-employer of AMX's employees. *See id.* The contract provides that

---

[1] The Court notes that it makes sense to address Gevity's motion for summary judgment before Mr. Field's motion for summary judgment precisely because Gevity's motion can moot Mr. Field's. Moreover, as the Court discussed with the parties at the hearing, the parties clearly had a disagreement over the scope of the summary judgment motions (*i.e.*, whether the motions were supposed to cover whether Gevity was the employer of the putative class in general or whether it was the employer of only Mr. Field specifically), and the parties' stipulation does not provide any clarity on the proper scope. As a matter of fairness, therefore, the Court was inclined to consider only the narrower issue of whether Gevity was the employer of Mr. Field and leave for another day the issue of whether Gevity was the employer of the putative class.

2

> Client shall at all times retain its status as an employer of WSEs but the entirety of an employer's rights and responsibilities shall be shared and allocated between Gevity and Client as set forth herein so that WSEs shall be simultaneously employed by both parties. Gevity shall be an employer of WSEs for employer responsibilities related to Gevity's Services defined in § 6.C [see above] and for purposes of compliance with the laws specified in § 7.A [regulatory compliance]. Client shall be the employer of WSEs for all employer responsibilities unrelated to Gevity's Services and for purposes of compliance with the laws specified in § 7.B [regulatory compliance].

*Id.*[2]

On or about March 25, 2005 – *i.e.*, after AMX entered into the Professional Services Agreement with Gevity – AMX extended an offer of employment to Mr. Field. *See* Berezin Decl., Ex. C (Field Depo., Ex. 4) (offer letter).

More specifically, AMX offered to hire Mr. Field as the executive director of its Western Division Wholesale Lending operations. The compensation was $22,000 per month for the first six months and, thereafter, the salary would be reduced to $12,500 per month. In addition, Mr. Field would be eligible for a bonus based on a calculation of fifteen percent of the pre-tax income of the Wholesale Western Division. The offer letter indicated that Mr. Field would be also entitled to benefits but made no mention of vacation. The letter was signed by AMX's then-president, Kevin A. Crichton. *See id.* In his deposition, Mr. Field testified that the terms and conditions of his employment were negotiated by Mr. Crichton and by Jack Mondel, AMX's chairman. *See* Field Depo. at 60. Mr. Field accepted the offer of employment on or about April 1, 2005. *See* Berezin Decl., Ex. C (Field Depo., Ex. 4) (offer letter).

In his deposition, Mr. Field testified that, as executive director, he was expected to open up offices that would focus on wholesale originations, manage those offices, and recruit people for those offices. *See* Field Depo. at 61. Mr. Field further testified that, per the offer letter, his salary was to be reduced to $12,500 after the first six months "based on the assumption that the western region would have had enough time to generate a growth in order to become profitable and then the reduction in salary would have been offset by profitability bonuses." *Id.* at 106.

---

[2] The agreement also specifies that "Client understands that with respect to Gevity, WSEs are at-will employees . . . ." *Id.* (Professional Services Agreement § 6.C).

3

According to Mr. Field, after his first six months of employment, his salary was reduced as provided in the AMX offer letter – but "with [his] reluctance" because "things [had] transpired in the first six months that made it impossible for us to achieve the profitability in order for [him] to earn the bonuses to offset the reduction." *Id.* at 107. Mr. Field attempted to renegotiate the terms of the offer letter with Mr. Crichton and Mr. Mondel, as well as with Bill Kelley (AMX's president of Wholesale Lending).[3] *See id.* at 111-12. Apparently, they agreed to reinstitute the $22,000 monthly salary for a short time, but subsequently Mr. Field's monthly salary was completely eliminated. *See id.* at 112-13.

Several months after Mr. Field's monthly salary was eliminated, AMX's Western Division was shut down completely. The decision to shut down the Western Division was made by Mr. Mondel. *See* Field Depo. at 18, 28.

## II.   DISCUSSION

A.   Legal Standard

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be rendered "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue of fact is genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). "The mere existence of a scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmoving party]." *Id.* at 252. At the summary judgment stage, evidence must be viewed in the light most favorable to the nonmoving party and all justifiable inferences are to be drawn in the nonmovant's favor. *See id.* at 255.

Where the plaintiff has the ultimate burden of proof, the defendant may prevail on a motion for summary judgment simply by pointing to the plaintiff's failure "to make a showing sufficient to

---

[3] The offer letter stated that Mr. Field was to report directly to Mr. Kelley. Mr. Field testified, however, that he ended up having more interaction with Mr. Crichton. *See* Field Depo. at 71.

4

establish the existence of an element essential to [the plaintiff's] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

B.   *Martinez*

Under California law, the question of whether an employment relationship exists is generally reserved for the trier of fact. This remains true where the evidence, though not in conflict, permits conflicting inferences. However, if neither the evidence nor the inferences are in conflict, then the question of whether there is an employment relationship becomes a question of law which may be resolved by summary judgment. *See Brassinga v. City of Mountain View*, 66 Cal. App. 4th 195, 210 (1998). More specifically, the court may decide the existence of an employment relationship as a matter of law if the evidence and inferences support only one reasonable conclusion.

In *Martinez v. Combs*, 49 Cal. 4th 35 (2010), the California Supreme Court explained that, where a plaintiff sues a defendant for wages pursuant to the California Labor Code, the defendant is liable only where it is the plaintiff's employer and the defendant is the employer if it (1) exercised control over the plaintiff's wages, hours, or working conditions; (2) allowed the plaintiff to suffer work or permitted the plaintiff to work; or (3) engaged the plaintiff, creating a common law employment relationship. *See id.* at 64.

In the instant case, Mr. Field argues that Gevity was his employer pursuant to the first test only. With respect to this test, the California Supreme Court has emphasized that it is "phrased . . . in the alternative (i.e., 'wages, hours, *or* working conditions')," which "has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship." *Id.* at 59 (emphasis added). According to Mr. Field, in his situation, Gevity exercised control over his wages and further exercised control over his working conditions. Mr. Field makes no assertion that Gevity exercised control over his hours.

C.   Wages

Mr. Field contends that Gevity exercised control over his wages because it paid his wages and further because Ms. Barr, a Gevity employee who acted as AMX's human resources director, changed his compensation in March 2007, *i.e.*, when his monthly salary was completely eliminated. The Court rejects both arguments.

First, although Gevity formally issued his paychecks and his W-2s, *see* Field Decl. ¶ 6, AMX was the company that actually paid Mr. Field's wages. This is established both by the Barr declaration and the Professional Services Agreement, as well as the "new hire packet" that Mr. Field received.[4] *See* Barr Decl. ¶¶ 5-6 (explaining that AMX funded the payroll); Berezin Decl., Ex. C (Field Depo., Ex. 4) (Professional Services Agreement §§ 6.C, 12.A) (although stating that "Gevity assumes responsibility for the payment of wages to WSEs without regard to payments by Client to Gevity," making clear that it was AMX's obligation to "pay Gevity the gross remuneration of WSEs [worksite employees]" and noting that, "[i]f Client defaults in paying the amounts due Gevity and Gevity continues to pay any wages to WSEs, Client shall fully indemnify and hold Gevity harmless from any and all claims made by WSEs for wages in excess of the amount paid by Gevity and all legal fees and expenses incurred in defense of such claims"); Field Decl., Ex. A ("Welcome to Gevity" cover page of new hire packet) (noting that AMX continues to be responsible for compensating employee for his or her work while Gevity is responsible for processing and issuing the employee's paycheck as determined by AMX).

Ultimately, Gevity's role was simply to carry out the ministerial task of payroll processing, and, in *Futtrell v. Payday Cal, Inc.*, 190 Cal. App. 4th 1419 (2010), the state court explicitly held that, where a company has essentially outsourced its payroll department to another company, the latter company does not exercise control over the employee's wages. "'[C]ontrol over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." *Id.* at 1432.

Second, although Mr. Field testifies in his declaration that Ms. Barr changed his compensation in March 2007 (*i.e.*, eliminated his monthly salary), *see* Field Decl. ¶ 21, that testimony flatly contradicts his prior deposition testimony. The following exchange occurred during Mr. Field's deposition.

> Q. And is it your understanding that the decision to eliminate your salary was made by Mr. Kelley?

---

[4] Gevity has objected to the new hire packet as hearsay. However, the documents comprising the packet are admissions of a party-opponent. They likely qualify as business records as well.

>          A.      I remember that it was Bill Kelley and Jack Mondel that made
>                  that decision.  The company was in dire straits, and there were
>                  also changes to the compensation of some of my employees.

*Id.* at 113.

The Ninth Circuit has held that "a party may not 'create his own issue of fact [on summary judgment] by an affidavit contradicting his prior deposition testimony.'" *Messick v. Horion Indus., Inc.*, 62 F.3d 1227, 1231 (9th Cir. 1995); *see also Foster v. Arcata Associates, Inc.*, 772 F.2d 1453, 1462 (9th Cir. 1985) (explaining that, "'[i]f a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact'").  While the court has also noted that the above "rule does not automatically dispose of every case in which a contradictory affidavit is introduced to explain portions of earlier deposition testimony," it has indicated that sham testimony is where the new testimony "flatly contradicts [the] earlier testimony." *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266-67 (9th Cir. 1991) (also stating that "the district court must make a factual determination that the contradiction was actually a 'sham'").  Here, there is a flat contradiction.  This is not just a case where a party is simply "elaborating upon, explaining or clarifying prior testimony elicited by opposing counsel on deposition." *Messick*, 62 F.3d at 1231 (also noting that "minor inconsistencies that result from an honest discrepancy, a mistake, or newly discovered evidence afford no basis for excluding an opposition affidavit").

Even if the Court were not inclined to find Mr. Field's declaration testimony sham testimony, there is another problem for Mr. Field.  In his declaration, he asserts that it was Ms. Barr who changed his compensation in March 2007 based on an e-mail that she sent him (and on which others were copied, including Mr. Kelley). *See* Field Decl. ¶ 21.  But that e-mail clearly reflects that it was Mr. Kelley and not Ms. Barr who made the decision to eliminate Mr. Field's monthly salary.  In the e-mail, Ms. Barr states: "I understand that you and Bill [Kelley] had a conversation last evening regarding the compensation for some of the CA employees. *To immortalize that discussion*

1  please note the following: [¶] 1. Your salary has been discontinued effective 2/11/07."[5] *Id.*, Ex. H
2  (e-mail from Ms. Barr) (emphasis added). In his declaration, Mr. Field disputes that, during the
3  discussion, he agreed to his monthly salary being eliminated. *See id.* ¶ 21. But this argument misses
4  the point. That was the information that was communicated to Ms. Barr; she did not make the
5  decision to change Mr. Field's compensation.
6        The Court thus finds that there is no genuine dispute of material fact that Gevity lacked
7  control over Mr. Field's wages.

D. <u>Working Conditions</u>

      Mr. Field argues that, even if Gevity did not exercise control over his wages, it still exercised control over his working conditions.

      In evaluating this contention, the Court first takes into account the Professional Services Agreement between Gevity and AMX. Under the Professional Services Agreement, AMX, and not Gevity, was the party with "the actual control over the day-to-day job duties of WSEs, and over all job sites at which and from which WSEs work." Berezin Decl., Ex. C (Field Depo., Ex. 4) (Professional Services Agreement § 6.A). The agreement also specified that AMX had "the right and obligation to supervise, direct and control the WSEs in order to conduct its business, discharge fiduciary responsibilities or comply with any federal, state or local licensure, regulatory, statutory or other legal requirement." *Id.* In addition, the agreement provided that, with respect to Gevity's services that they "will provide Client with suitable tools, vendors and other products (jointly, 'Tools') designed to assist Client in making employment decisions such as hiring, supervision, training, appraisal, discipline and termination (jointly, 'Employment Decisions'), but in every instance the election to utilize any Tools and to make Employment Decisions will be made by Client and not by Gevity." *See id.* (Professional Services Agreement § 6.F). Admittedly, the agreement contained a provision stating that "Gevity reserves a right of direction and control over WSEs and retains authority to hire, terminate its employment of, and discipline and reassign, WSEs," but this

---

[5] Gevity has objected to the e-mail on the basis of hearsay. However, the e-mail constitutes an admission of a party-opponent.

1   provision was tempered by language that "Gevity's retention of rights shall not be deemed a
2   mandate to exercise such rights . . . ." *Id.* (Professional Services Agreement § 6.A).
3         Of course, the Professional Services Agreement is not dispositive.  That is, regardless of
4   what the agreement stated, if Gevity actually conducted itself in a way to control Mr. Field's
5   working conditions, then it could still be deemed his employer for purposes of the California Labor
6   Code.  According to Mr. Field, Gevity did exercise such control in the following ways: (1) Gevity
7   administered the 401(k) plan as well as employee leaves of absence under the Family Medical Leave
8   Act ("FMLA"); (2) Gevity provided benefits (*e.g.*, health, dental, COBRA); (3) Ms. Barr, Gevity's
9   employee, acted as AMX's human resources director and Mr. Field consulted her and/or obeyed her
10  instructions on human resources matters; (4) Gevity provided training; and (5) Gevity helped to
11  enforce the sexual harassment policy.
12        The Court finds Mr. Field's position unconvincing.  None of the evidence provided by Mr.
13  Field creates a genuine dispute of material fact that Gevity exercised sufficient control over his
14  working conditions such that it should be deemed his employer for purposes of the California Labor
15  Code.
16        *Administration of 401(k) plan and employee leaves of absence under the FMLA.*  With
17  respect to Gevity's administration of the 401(k) plan and employee leave of absences under the
18  FMLA, there is nothing to indicate that this was anything but a ministerial task analogous to payroll
19  processing.
20        *Provision of benefits.*  As for Mr. Field's claim that Gevity provided benefits, Gevity has
21  objected that Mr. Field lacks personal knowledge on the matter.  The Court agrees.  The Gevity
22  documents attached to Mr. Field's declaration indicate that Gevity played a role in benefits
23  administration, *see* Field Decl., Ex. C, but they do not support Mr. Field's implicit contention that
24  Gevity, instead of AMX, actually paid for the benefits.  Indeed, the new hire packet indicates that
25  AMX paid for them.  *See* Field Decl., Ex. A ("Welcome to Gevity" cover page of new hire packet)
26  (noting that AMX continues to be responsible for compensating employee for his or her work,
27  providing benefits, and determining paid time-off policies while Gevity is responsible for processing
28  and issuing the employee's paycheck as determined by AMX).

*Obedience on human resources matters.* Mr. Field's assertion that Gevity exercised control because Ms. Barr was AMX's human resources director and he had to consult her and/or obey her on human resources matters fares no better. There is admittedly evidence indicating that Ms. Barr functioned as AMX's human resources director (*e.g.*, her self-described title of "Human Resources Manager," as reflected in her e-mails).[6] *See* Field Decl. ¶ 13. There is also evidence that Mr. Field consulted Ms. Barr on human resources matters. However, Mr. Field's contention that he had to obey Ms. Barr on human resources matters is ultimately without evidentiary support. For example, Mr. Field claims that he had to defer to Ms. Barr's decisions regarding hiring, but his declaration indicates that Ms. Barr conducted only ministerial background checks. *See id.* ¶ 16. Mr. Field also claims that he had to obtain Ms. Barr's approval for salary increases, but the e-mails attached to Mr. Field's declaration clearly indicate that, while Ms. Barr may have provided opinions about compensation, the decision maker on compensation was Mr. Kelley, and not Ms. Barr. *See id.*, Ex. G (e-mail, dated 6/11/2007, from Ms. Barr to Mr. Kelley, asking Mr. Kelley for his approval of Mr. Field's actions; e-mail exchange, dated 5/11/2007, between Ms. Barr and Mr. Kelley, reflecting final decision on compensation made by Mr. Kelley; e-mail, dated 4/17/2007, from Ms. Barr to Mr. Field and Mr. Kelley, stating that she has been instructed that all compensation issues are to be cleared through Mr. Kelley); *see also id.* ¶ 20 (admitting that Mr. Kelley or Mr. Crichton could override Mr. Barr's decisions). As another example, Mr. Field maintains that Ms. Barr had to approve employee discipline and termination, but his declaration establishes that he himself actually made the decision to terminate an employee and only had to get Ms. Barr's approval to the limited extent of ensuring that proper procedures were followed "to limit the legal risks." *Id.* ¶ 28. Finally, Mr. Field asserts that Ms. Barr instructed him to lay off the California employees but his deposition establishes that the decision to close the Western Division was Mr. Mondel's. *See* Field Depo. at 18, 28.

While the evidence proffered by Mr. Field may suggest that Gevity exercised limited control over certain aspects of the working conditions of employees subordinate to Mr. Field, the evidence does not establish that Gevity exercised control over him or his working conditions. Mr. Field cites

---

[6] Gevity has objected to the e-mails as hearsay, but again they are admissions of a party-opponent.

no authority establishing the proposition that, where a person or entity has involvement over the hiring or firing process for subordinate employees, that constitutes control over the manager's "working conditions" within the meaning of *Martinez*. To hold otherwise would mean that, for wage liability purposes, practically any human resources director would be deemed an "employer" of, *e.g.*, a CEO simply by virtue of the human resources director's role in managing certain aspects of the CEO's subordinates. Given Genvity's limited role in this case, its involvement in personnel matters of subordinate employees did not constitute control of Mr. Field's "working conditions."

The Court further notes that, in evaluating Mr. Field's contention that he had to obey Ms. Barr on human resources matters, it has taken into account not only Mr. Field's declaration but also the declarations of the three office managers who have filed declarations in support of Mr. Field. *See generally* McCollum Decl., Riccio Decl., Johnson Decl. These declarations, however, do not provide any evidence whatsoever about the relationship between Mr. Field and Ms. Barr. While the declarations do discuss how the *office managers* purportedly had to obtain Ms. Barr's approval on certain human resources matters, this evidence is not probative of *Mr. Field's* direct duties (at least based on the record presented) to have any bearing on the issue of whether Ms. Barr exercised control over *Mr. Field's* working conditions, even taking into account that the office managers were his subordinates.

*Training by Gevity.* Turning to the issue of training by Gevity, the evidence reflects that Gevity conducted very limited training. In his declaration, Mr. Field refers to one sexual harassment training and one other training with an unidentified subject matter. *See* Field Decl. ¶¶ 30-31. Nothing indicates that Gevity conducted extensive training or that Gevity provided any training related to Mr. Field's job duties (as opposed to more collateral matters such as sexual harassment). *See also* Field Depo. at 89-90 (testifying that Ms. Pace provided loan-related training, that branch managers provided sales training, and that Mr. Field himself approved training or that "corporate" did).

*Enforcement of sexual harassment policy.* This leaves only Mr. Field's contention that Gevity exercised control over his working conditions because it was responsible for enforcing the sexual harassment policy. While the new hire packet does indicate that Gevity played a role in

enforcement of the policy, *see* Field Decl., Ex. A (sexual harassment policy included as part o new hire packet), and there is also evidence that Mr. Field consulted Ms. Barr regarding a relationship between Mr. Crichton and another employee, *see* Field Decl. ¶¶ 32-33, this again is at most a limited role for Gevity.

In sum, based on the evidence submitted by Mr. Field, Gevity played a very limited role with respect to Mr. Field's working conditions. Given this very limited role, there is only one reasonable conclusion – *i.e.*, that Gevity lacked sufficient control over Mr. Field's working conditions such that it should be held responsible for paying Mr. Field's wages.

Notably, Mr. Field has not cited any authority establishing that control over a limited area is enough to make a company an employer for purposes of the California Labor Code – particularly in a situation like this where there is no evidence that Ms. Barr had the authority to hire or fire Mr. Field specifically. While Mr. Field has cited *Bustamante v. Teamone Employment Specialists, LLC*, No. B222136, 2011 Cal. App. Unpub. LEXIS 3664 (Cal. Ct. App. May 17, 2011), it is not a published case and, contrary to what Mr. Field argues, the unpublished case is not citable authority. California Rule of Court 8.1115 provides that, with limited exceptions which are not applicable here, "an opinion of a California Court of Appeal or superior court appellate division that is not certified for publication or ordered published must not be cited or relied on by a court or a party in any other action." Cal. R. Ct. 8.1115(a). Mr. Field's suggestion that the case may be cited under the Ninth Circuit rules or the rules of this Court is without merit. Ninth Circuit Rule 36-3 deals with unpublished decisions of the Ninth Circuit, not state courts. Similarly, Civil Local Rule 7-14 deals with decisions by this Court, not state courts. *See* Civ. L.R. 7-14 (providing that "[i]t is within the sole discretion of the issuing Judge to determine whether an order or opinion issued by that Judge shall not be citable").

Even if *Bustamante* could be cited as persuasive authority, it does little to support Mr. Field's position. Mr. Field claims that, under *Bustamante*, a party need only show that a defendant exercised "some control." While it is true that the court in *Bustamante* stated that "the District exercised some control over plaintiffs' wags, and therefore it was an employer of plaintiffs," *Bustamante*, 2011 Cal. App. Unpub. LEXIS 3664, at *23, that statement should not be taken

literally, particularly where in an earlier part of the opinion the court stated "conflicting inferences could be drawn whether those provisions gave the District *sufficient* control over those issues to be deemed an employer." *Id.* at *22 (emphasis added).

Finally, the decision in *Futtrell* weighs against Mr. Field. In *Futtrell*, the court noted that "[t]he employer . . . is the party who hires the employee and *benefits from the employee's work*, and thus it is the employer to whom liability should be affixed for unpaid wages." *Futtrell*, 190 Cal. App. 4th at 1432 (emphasis added). Even if Gevity had control over human resources matters, more specifically, in the limited way described in Mr. Field's declaration, it is not clear how *it* benefitted from Mr. Field's work such that it should be held accountable for *his* wages. *Martinez* is not to the contrary. In *Martinez*, the California Supreme Court gave as an example of a situation in which multiple entities control different aspects of the employment relationship

> as when one entity, which hires and pays workers, places them with other entities that supervise the work. Consistently with this observation, the IWC has explained its decision to include the language in one modern wage order as specifically intended to include both temporary employment agencies and employers who contract with such agencies to obtain employees within the definition of employer.

*Martinez*, 49 Cal. 4th at 59. Clearly, the instant case does not involve the above-described situation.

### III.  CONCLUSION

For the foregoing reasons, the Court grants Gevity's motion for summary judgment. Because the Court is granting Gevity's motion, Mr. Field no longer has any claims against Gevity and his own motion for summary judgment is therefore moot.

Because Mr. Field initially brought this lawsuit as a class action, the Court shall give his counsel an opportunity to substitute a new plaintiff and proposed class representative with respect to the claims asserted against Gevity.[7] More specifically, counsel shall have sixty (60) days to find such a person *and* file a motion to substitute that person in this litigation. The Court notes that, to the extent Gevity contends that it did not employ that individual (as it did not employ Mr. Field), it

---

[7] AMX, although apparently defunct, is still a defendant in this case. Mr. Field still has claims against AMX directly and therefore can potentially represent a class vis-à-vis AMX.

may oppose the motion to substitute on those grounds.[8] The Court does not intend the motion to substitute, however, to otherwise constitute the means to litigate either the adequacy of the new plaintiff or proposed class representative for purposes of Federal Rule of Civil Procedure 23.

Finally, the Court sets a case management conference in this case for November 21, 2011, at 3:30 p.m. A joint case management conference statement shall be filed by November 14, 2011.

This order disposes of Docket Nos. 62 and 67.

IT IS SO ORDERED.

Dated: August 2, 2011

_____
EDWARD M. CHEN
United States District Judge

---

[8] Accordingly, counsel for Mr. Field is advised that evidence to support the claim that Gevity employed the new plaintiff/proposed class representative should be provided even as part of the opening brief.